

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

JOSEPHINE WILLIAMS,                )
                                   )
        Plaintiff,                )
                                   )   No. 07 C 3716
vs.                                )
                                   )   Magistrate Judge Schenkier
MICHAEL J. ASTRUE, Commissioner    )
of the Social Security Administration, )
                                   )
        Defendant.                )

## MEMORANDUM OPINION AND ORDER

This case involves an appeal by plaintiff, Josephine Williams, after a denial by the Commissioner of Social Security ("Commissioner") of Ms. Williams's October 5, 2005 application for Disability Insurance Benefits ("DIB"). In her application, Ms. Williams claimed an inability to work as of May 1, 2005, due to lung disease and dyspenea (R. 41, 94, 97, 103, 106, 108). Ms. Williams's application was denied on December 16, 2005 (R. 37). Thereafter, Ms. Williams filed a request for reconsideration on January 17, 2006 (R. 43), which was denied on February 9, 2006 (R. 44).

Ms. Williams filed a Request for Hearing on April 3, 2006 (R. 50). On October 19, 2006, a hearing was held before an Administrative Law Judge ("ALJ") (R. 692). On February 21, 2007, the ALJ issued a written decision finding that Ms. Williams was not disabled, and denying Ms. Williams's claim for benefits (R. 11, 14-20). On April 11, 2007 Ms. Williams filed with the Appeals Council a request for review of the ALJ's decision of February 21, 2007 (R. 8-10). Her appeal was denied on May 9, 2007 (R. 5), making the ALJ's opinion the final decision of the Commissioner. This appeal followed.

Now pending before the Court are the parties' respective motions for summary judgment (doc. ## 19, 25). For the reasons stated below, the Court grants Ms. Williams's motion for summary judgment and denies the Commissioner's cross-motion for summary judgment. The Court reverses the decision of the Commissioner, and remands the case for further proceedings consistent with this opinion.

## I.

We begin with a brief review of the legal standards. In order to establish a "disability" under the Act, a claimant must show an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A) (2002). Under Section 423(d)(2)(A), a claimant must demonstrate that her impairments prevent her from performing not only her past work, but also any other work that exists in significant numbers in the national economy.

The social security regulations prescribe a sequential five-step test for determining whether a claimant is disabled. *See* 20 C.F.R. § 404.1520 (2002). Under this rule, the ALJ must consider: (1) whether the claimant is presently unemployed; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the claimants impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) whether the claimant is unable to perform her past relevant work; and (5) whether the claimant is unable to perform any other work existing in significant numbers in the national economy. *See* 20 C.F.R. § 404.1520(a)(4)(i)-(v); *see also Young v. Sec'y of Health and Human Services*, 957 F.2d 386, 389 (7th Cir. 1992).

A finding of disability requires an affirmative answer at either Step 3 or Step 5. A negative answer at any step other than Step 3 precludes a finding of disability. *Id.* The claimant bears the burden of proof at Steps 1 through 4, after which the burden of proof shifts to the Commissioner at Step 5. *Id.* In cases of severe impairment, the ALJ's analysis at Step 4 typically involves an evaluation of the claimants residual functional capacity ("RFC") to perform the past relevant employment. *See* 20 C.F.R. § 404.1520(e). If a person can still do this kind of work, the Commissioner will find that the person is not disabled. 20 C.F.R. § 404.1520(f). If a person cannot perform past relevant work, at Step 5 the Commissioner must evaluate the claimant's RFC to perform any other work in the national economy (other than the relevant past occupation). *See Bowen v. Yuckert*, 482 U.S. 137, 142 (1987); 20 C.F.R. § 404.1520(g). If substantial jobs exist in the national economy for a person with the claimant's RFC, the Commissioner will find the person not disabled.

In reviewing the ALJ's decision, this Court may not decide facts anew, reweigh the evidence, or substitute its own judgment for that of the ALJ. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The Court must accept the findings of fact that are supported by "substantial evidence," 42 U.S.C. § 405(g) (2002), which is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Dray v. R.R. Retirement Bd.*, 10 F.3d 1306, 1310 (7th Cir. 1993) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). When conflicting evidence allows reasonable minds to differ, the responsibility for determining whether the claimant is disabled falls upon the Commissioner (or the ALJ), not the courts. *See Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990); *see also Stuckey v. Sullivan*, 881 F.2d 506, 509 (7th Cir. 1989) (the ALJ has the authority to assess medical evidence and give greater weight to that which the ALJ finds more

credible). The Court is limited to determining whether the Commissioner's final decision is supported by substantial evidence and based upon proper legal criteria. *Ehrhart v. Secy of Health and Human Services*, 969 F.2d 534, 538 (7th Cir. 1992). A finding may be supported by substantial evidence even if a reviewing court might have reached a different conclusion. *See Delgado v. Bowen*, 782 F.2d 79, 83 (7th Cir. 1986) (per curium).

However, the ALJ is not entitled to unlimited judicial deference. The ALJ must consider all relevant evidence, and may not elect to discuss only the evidence which favors his or her ultimate conclusion. *See Herron*, 19 F.3d at 333. Although the ALJ need not evaluate in writing every piece of evidence in the record, the ALJ's analysis must be articulated at some minimal level and must state the reasons for accepting or rejecting "entire lines of evidence." *Id.*; *see also Young*, 957 F.2d at 393 (the ALJ must articulate a reason for rejecting evidence within reasonable limits if there is to be meaningful appellate review). The written decision must provide a "logical bridge from the evidence to [the] conclusion" that allows the reviewing court a "glimpse into the reasoning behind [the] decision to deny benefits." *See, e.g. Zurawski v. Halter*, 245 F.3d 881, 887, 889 (7th Cir. 2001). Specific reasons are required so that the reviewing court can ultimately assess whether the ALJ's determination was supported by substantial evidence or, if not, was patently wrong. *Id.*

## II.

The following facts are taken from the record and are material to our review.

### A.

Ms. Williams was born on July 28, 1943 (R. 35, 80, 94). She received an associate's degree from Malcolm X College and in 2000 she received a Bachelor's of Science degree in Molecular Microbiology from Chicago State University (R. 80, 695). According to Ms. Williams, she is unable

4

to sit or stand for long periods of time (R. 152), but she remains active by vacuuming, cooking and doing normal household chores (R. 123, 397).

From 1967 to 1993, Ms. Williams worked a five-day, 40 hour week at the Leaf Candy Company as a microbiology technician (R. 128, 129, 170). In that job, Ms. Williams picked up and tested samples of finished candy product "off the line" (R. 695), and tested those samples for bacteria such as salmonella and *E. coli* (R. 129, 695-96). The job required Ms. Williams to lift three to four-gallon pails of water to use in the salmonella testing (R. 696).[1] That job also required Ms. Williams to be on her feet (R. 695), and required her to pay close attention to detail (R. 696). Ms. Williams left her job with Leaf Candy Company when the manufacturing plant was moved out-of-state in 1993 (R. 698).

Shortly thereafter, Ms. Williams began working as a home health aide for Helping Home from 1993 or 1994 to 2004 or 2005 (R. 128, 698, 732). Ms. Williams worked as a home health aide two days each week (R. 130). According to Ms. Williams, she had just one client during her employment with Helping Home (R. 698). This job require Ms. Williams to clean, wash and cook for her client (R. 698). When questioned by the ALJ during the administrative hearing, Ms. Williams testified that it was "too hard" for her to perform this work on a full-time basis (R. 732).

The record also indicates that Ms. Williams received income from other employers after leaving the Leaf Candy Company. *First*, Ms. Williams worked periodically for the Chicago Public School System: first, as a tutor from 2000 to 2002, and then as a substitute teacher from 2002 to the

---

[1] In one questionnaire prepared prior to the administrative hearing, Mr. Williams described lifting "2 lbs" of product sample "for about 10-15 ft" (R. 129).

5

time of the administrative hearing (R. 170).² Ms. Williams earned $814 from the school district in the final three months of 2005 (R. 704), and an additional $45 during the first three months of 2006 (R. 703). The record also indicates that Ms. Williams received $1,315 during the First Quarter of 2006 from the "Educate Operating Company" for work in an after school program (R. 703). Her duties for this company were not described in the record.

*Second*, Ms. Williams worked as product demonstrator for Kit Moss Productions, Inc. from 1998 until the time of the administrative hearing (R. 170, 703). In this position, Ms. Williams distributed free samples to customers in stores (R. 703). During the last three months of 2005, she earned $1,113 from her product placement position, and in the first three months of 2006, Ms. Williams earned $945 (R. 703, 704). During the hearing, the ALJ noted that her combined income added up to $1,927 in the Fourth Quarter of 2005 and $2,305 in the First Quarter of 2006 (R. 704). The ALJ stated that "[t]his is not a threshold for substantial gainful activity, but we must think about it in terms of whether or not she could sustain some lower level of exertional [sic] and whether or not she has transferable skills" (R. 705).

### B.

During the administrative hearing, Ms. Williams responded to questions from the ALJ and from Dr. David Cugell, a medical expert ("ME") called by the ALJ, regarding the nature of her medical conditions. Ms. Williams testified that she had experienced increasing shortness of breath "for the last two years or so" (R. 699). The ALJ also confirmed that Ms. Williams was receiving medication for high cholesterol, hypertension, osteoporosis, and that she was using an oxygen tank

---

²Conflicting evidence in the record suggests Ms. Williams started working for an "educational institution" as early as December 1993 (R. 128).

at her intake interview (R. 699). When asked about whether she was taking any additional medications, Ms. Williams testified that she was taking a sinus medication and Baclofen for arthritis pain (R. 701-02). Ms. Williams also testified that she underwent an echocardiogram test, two pulmonary function tests, and was admitted into the hospital in July 2006 (R. 699-701).

The ALJ asked Ms. Williams why she thought that she could "not do even a sitting job eight hours a day, five days a week," while lifting no more than 10 pounds (R. 705). Ms. Williams testified that "[t]he sitting makes my back hurt and my knees" (R. 705). Ms. Williams also stated that going up steps creates a breathing problem (*Id.*), but she confirmed that the only reason she was not able to tolerate full time employment with limited exertion was due to pain in her back and knees (*Id.*). When asked by the ALJ about her ordinary activities, Ms. Williams testified that she goes to work "[w]henever I feel like it" (R. 706). She also noted that having doctors' appointments up to four times a month disrupts her schedule (R. 706). Next, the ALJ gave Ms. Williams the opportunity to relate any additional information that he may have overlooked (R. 707). Ms. Williams replied that she gets an ear ache and that her fingers hurt to the point that she can't type any more because of pain (R. 707).

On examination by her own attorney, Ms. Williams testified that hot and cold temperatures cause problems for her (R. 707). According to Ms. Williams, heat exposure triggers coughing fits and breathing difficulties (R. 708). She also testified that cold causes pain in various parts of her arms and legs (R. 708). She said that dust and odors such as cologne and aerosols cause coughing spells of 5-10 minutes in duration (R. 709-10). According to Ms. Williams, she also became fatigued walking to the second floor when she was substitute teaching (R. 710-11).

After reviewing Ms. Williams's medical records, the ME asked Ms. Williams a series of questions having to do with "identifying the cause for her symptoms" (R. 715). *First*, he asked Ms. Williams what diagnosis she received from her cardiologist, and Ms. Williams responded that she was diagnosed with a heart murmur and chest pain (R. 713). *Second*, the ME asked about Ms. Williams pulmonary care (R. 714). She responded that her blood was regularly checked (R. 714). *Third*, in response to the question of whether additional tests were planned to evaluate her heart condition, Ms. Williams responded: "[n]ot right now because [my doctor] said he was going to discontinue them right now because I got real sick in July, and that kind of stopped the tests" (R. 715).

### C.

The medical records presented the following information regarding Ms. Williams's condition. A CT scan (commonly referred to as a "CAT scan") dated March 15, 2006, found "[n]o evidence for chronic pulmonary embolus as clinically questioned" (R. 491). In layman's terms, this indicates that no blockage was found in her pulmonary arteries, which carry blood from the heart to the lungs. A thallium scan (commonly referred to as a cardiac stress test, which measures arterial blood flow during physical exercise) performed on June 27, 2005 similarly indicates findings that "are most consistent with normal myocardial perfusion [heart function]" (R. 496). Additionally, a lung scan dated January 18, 2006, states "[l]ow probability . . . for pulmonary embolus [lung blockage]" (R. 476).

However, a chest x-ray report dated September 14, 2005, indicates that "there appears to be [] mild dextroscoliosis of the upper thoracic spine" (referring to a medical condition in which one's spine is curved from side to side) (R. 489). A bone densitometry test (used to diagnose osteoporosis)

8

dated November 4, 2004 indicates "[f]indings [] consistent with osteoporosis within the lumbar spine and right femoral neck" and "[o]steopenia[3] within the left femoral neck" (R. 493). For medication, Ms. Williams took aspirin, Diltiazem, Enalapril, Fosamax, Hydrocholorothiazide, and Toprol (R. 154). The medical records also indicate that she was seen by three physicians: Dr. John Shannon, Dr. Victoria Gomez, and Dr. Ansearie Imraan (R. 173).

A physical RFC assessment performed by agency examiner, E.W. Donelan, on December 2, 2005, stated that Ms. Williams's medical records refer to heart problems and osteopenia (R. 397). Dr. Donelan's primary diagnosis is listed as chronic pulmonary insufficiency (R. 390),[4] with a secondary diagnosis of heart disease (R. 390). Dr. Donelan concluded that these conditions "do not preclude the claimant from normal daily activities" (R. 397). This assessment was reviewed and affirmed by a second agency examiner, Dr. Ernst Bone, on February 7, 2006 (R. 479-80).

Neither of the agency examiners physically examined Ms. Williams. Neither of the examiners' RFC determinations took into consideration any conditions of Ms. Williams other than her cardiac and pulmonary conditions.

### D.

Dr. Cugell, the ME called by the ALJ, testified at the administrative hearing (R.711). The ME confirmed that he struggled with "finding a medical diagnosis to describe the symptoms which she's experiencing" (R. 716). The ME testified, that while Ms. Williams's had a "relatively normal pulmonary function test," electrocardiographic changes in a cardiac study raise "more serious

---

[3]Osteopenia is a decrease in bone mineral density that can be a precursor condition to osteoporosis, which is a bone disease that increases the risk of bone fractures.

[4]According to the Social Security Administration, "chronic pulmonary insufficiency" refers to several types of breathing disorders. *See* 20 C.F.R. Pt. § 404, Subpt. P, App. 1.

concern" (R. 716). The ME opined that "severe impairments have to match some sort of functional deficit" and, he did not "quite see that we have that data" (R. 719). However, the ME testified that "if [the data] does exist, it's in [the] . . . coronary artery system and not in her respiratory" system (R. 719).

The ALJ then asked the ME: "if we are just looking at the whole clinical medical record and not listening to the Claimant, are we basically looking at only osteoporosis, osteopenia, [and] hypertension[5] as established impairments?" (R. 719). The ME responded that: "[w]ell there's this suspicion of coronary artery problem. I wouldn't disregard that, but I cannot blame her breathing problems on lung function" (R. 719). The ME agreed with the ALJ that there was not "an impairment present that would meet or equal one of the [C]ommissioner's listings like 3.02 or 3.03, which have to do with asthma and restricted disease" (R. 723).

Then, the ALJ asked the ME whether "the record is adequate for you to form an opinion about what her work-related functioning might be" (R. 724). The ME testified that he was able to form an opinion, and he opined that Ms. Williams "certainly should be capable of continuing the light type work that she has previously and recently performed" (R. 724). The ME added that it "would seem prudent" to avoid excessive dust, fumes, heat and temperature extremes (R. 724).

On examination by Ms. Williams's attorney, the ME stated that his opinion about Ms. Williams's ability to perform light work was offered "strictly on the basis of the pulmonary and cardiac components to her overall health" (R. 725), and thus did not consider Ms. Williams's testimony about disabling pain in her back and knees. The ME observed that Ms. Williams's testimony "included complaints that have not been the subject of much medical surveillance,

---

[5]Hypertension is commonly referred to as high blood pressure.

10

specifically the backache" (*Id.*). The ME questioned whether an MRI of the spine was performed, or if there had been an orthopedic assessment or straight-leg raising tests (*Id.*). The ME stated that those and other tests could ascertain facts that might be "a substantial contributor to her limited mobility at the present," and that this was "a factor that should be considered" (*Id.*).

Ms. Williams's attorney asked the ME if Ms. Williams's complaints were "consistent with this impression in the bone densitometry test" (R. 727), and if there was anything "that you could suggest might be done where it might shed some light on exactly what is causing either the breathing problems and the chest pain, or the back problems and the leg problems" (R. 728). The ME initially said, "I don't have an answer for you" (R. 728). The ME then stated that, "I would start with a rheumatologist" (R. 728), and that a single leg reflex test "should be done by an orthopedic" doctor (R. 729). The ME further opined:

> "[D]epending on these – this joint examination, leg raising and what not, you might want to do an MRI of the lumbar vertebrae, maybe a neurological. The rheumatologist can do all this. See if there's any neurological complications of the joint."

(R. 730).

### E.

The ALJ also called a vocational expert ("VE"), Ms. Linda Gels, to testify at the hearing (R. 730). The ALJ asked the VE if Ms. Williams would "be able to do the past relevant work" but for her environmental limitation (R. 737). The VE opined "[f]or the food tester for sure" (R. 737), but she was less clear in her response regarding the homemaker position (R. 738). The ALJ then asked the VE whether Ms. Williams had "any skilled experience as far as her previous work that is so similar to the tools, processes and industry of other work that she would have to make very little

11

adjustment if any, in order to transfer her skills, assuming she couldn't do her old job" (R. 738). Before responding, the VE specifically stated that she was not considering the homemaker position, because it "wasn't really a skilled job anyway . . . [s]o, that's out of the picture" (R. 738). Then, based on the ALJ's question, the VE opined, "I don't think that she does have the level of skills that are captured in that statement [by the ALJ] . . . I'm just not sure how I could say there are these readily available skills for her to walk out the door with" (R. 738-39).

The VE never offered any testimony about specific categories of jobs Ms. Williams could perform. At the close of the VE's testimony, the ALJ acknowledged that "if the Claimant can't go back to her past relevant work, she's going to grid out" (R. 740).[6]

## F.

In determining whether Ms. Williams suffered from a disability as defined in the Social Security Act, the ALJ conducted the standard five-step inquiry. *See* 20 C.F.R. § 404.1520. In his opinion, the ALJ found that Ms. Williams satisfied the requirements of Steps 1 and 2 (R. 16-17). Specifically, the ALJ found that she met the insured status requirements through December 31, 2009, that she had not engaged in substantial gainful activity since the alleged onset date of May 1, 2005; and, that she had the severe impairments of pulmonary hypertension, hypertension, femoral neck osteoporosis, and status post hysterectomy, appendectomy and tuberculosis (R. 16-17). At Step 3, the ALJ found that these severe impairments did not meet or medically equal one of the listed

---

[6]We interpret the ALJ's use of the phrase "grid out" to mean that given her age, an inability to perform past relevant work could render Ms. Williams disabled under the Social Security Administration's Medical Vocational Guidelines (the "grids"). *See* 20 C.F.R. Pt. 404, Subpt P. App. 2. These guidelines are "a series of tables broken into separate rules 'which classif[y] a claimant as disabled or not disabled based on the claimant's physical capacity, age, education, and work experience." *Haynes v. Barnhart*, 416 F.3d 621, 627 (7th Cir. 2005) (citing *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987).

impairments in 20 C.F.R. § 404.1520(d), 404.1525, 404.1526. The ALJ found support for this finding from the medical records provided by Ms. Williams's attending physician (R. 17).

Turning to the RFC in Step 4 of the analysis, the ALJ found that Ms. Williams has:

> "The residual functional capacity to lift and carry 20 pounds occasionally and 10 pounds frequently; sit for a total of at least 6 hours in an 8-hour workday; stand and/or walk for a total of 6 hours in an 8-hour workday; and tolerate no more than mild (less than moderate) exposure to dust, fumes, odors or temperature extremes."

(R. 17). The ALJ based this finding on a review of the record evidence, as well as on his credibility determination of Ms. Williams (R. 17-19).

On this latter point, the ALJ states that he found "the claimant's medically determinable impairments reasonably could be expected to produce some of the alleged symptoms, but that her statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible" (R. 18-19). The ALJ provided several reasons for this finding: (1) discrepancies between her testimony and her self-reported daily living activities (R. 19); (2) ability to vacuum and do "normal house cleaning and chores" (*Id.*); (3) overemphasis on the demands of her past relevant work (*Id.*); (4) "[d]iagnostically, the record fails to correlate impairments that reasonably would be expected to produce symptoms of the intensity and restriction that the claimant asserted" (*Id.*); and (5) lack of record evidence and "opinions from treating or examining physicians indicating that the claimant is disabled or even has limitations greater than those assigned in this decision" (*Id.*). Based on the foregoing, the ALJ concluded that "[t]here is no objective basis warranting more restrictive limitations." (*Id.*).

The ALJ also stated that in reaching the RFC assessment, he gave "controlling weight" to the ME's testimony (R. 19). The ALJ found that the RFC conclusions reached by the ME were

13

"consistent with other substantial evidence and appears well-supported," and that they agreed with "the opinion of the non-examining state agency medical consult[] who inferred a functional capacity for light work, subject to no work around excessive dust, fumes, odors or temperature extremes" (*Id.*). The ALJ further stated that Ms. Williams's work as a product demonstrator and part-time teacher, "while not substantial gainful activity, tends to correspond with this functional assessment" (*Id.*). According to the ALJ, "[o]verall, the probative medical and documentary evidence tends to support an inference that the Claimant retains a maximum residual functional capacity for light work, subject to no work around excessive dust, fumes, odors or temperature extremes" (*Id.*).

Finally, the ALJ concluded at Step 4 that Ms. Williams had the RFC to perform the job of a home health aide, which he described as "past relevant work" (R. 20). The ALJ based this conclusion on the VE's testimony that the work Ms. Williams performed as a home health aide "coincided with the assigned residual functional capacity" (*Id.*). The ALJ also based this conclusion on Ms. Williams's testimony that, "but for the environmental limitations," she "could have returned to past relevant work as a microbiology technician" (*Id.*). As a result of these Step 4 findings, the ALJ did not make any Step 5 determination (*Id.*).

### III.

Ms. Williams has identified the following three issues on appeal: (1) that the ALJ erred in his Step 4 determination of Ms. Williams's RFC by relying on the ME's testimony (Pl.'s Mem. at 9-11); (2) that the ALJ's credibility analysis does not comport with SSR 96-7p (*Id.* at 11-13); and (3) that Ms. Williams's previous employment as a home health aide cannot be classified as "past relevant work" for purposes of the Step 4 analysis (*Id.* at 13-14). We address only Ms. Williams's

Step 4 arguments, which we find dispositive. Two deficiencies in the ALJ's Step 4 analysis require a remand.

*First*, the ALJ selectively – and erroneously – relied on the ME's testimony. The ALJ gave "controlling weight" to the ME's testimony as to Ms. Williams's RFC, which was based solely on the "pulmonary and cardiac components to her overall health" (R. 725). In so doing, the ALJ failed to acknowledge, much less discuss, the ME's related testimony that the pain that Ms. Williams described in her knees and back could be "a substantial contributor to her limited mobility at the present," and that this was therefore "a factor that should be considered" (R. 725).

The ME plainly acknowledged that the ability to fully assess these conditions was beyond his expertise: when asked whether Ms. Williams's complaints were consistent with the results of a bone densitometry test, the ME responded "[w]ell, you're little out of my league, and I'm not a rheumatologist" (R. 727). That said, the ME did identify testing that could be done to medically assess Ms. Williams's back and knee pain complaints: (a) a straight leg raising test "that should be done by an orthopedic" doctor (R. 729); (b) a joint examination (R. 730); (c) an MRI of the lumbar vertebrae (*Id.*); and, (d) perhaps a neurological examination should be done, to determine whether "there's any neurological complication of the joint" (*Id.*).

By these statements, the ME plainly did not reject Ms. Williams's complaints of back and knee pain. To the contrary, he indicated that those conditions complained by Ms. Williams should be considered, and he outlined the kind of medical professionals that should be consulted and the type of testing that should be done. Yet, the ALJ's opinion professes to give the ME's assessment "controlling weight" (R. 19) without addressing these points. The ALJ was not entitled to take those portions of the ME's opinion with which he agreed, and then to ignore the rest. *Herron*, 19 F.3d at

333. If the ALJ wished to discount the ME's opinion about the potential significance of Ms. Williams's back and knee pain, and the kind of testing that was required to assess it, and accept the rest of the ME's opinion, the ALJ was obligated to articulate his reasons for doing so. *Id.* (an ALJ must minimally articulate reasons for accepting or rejecting "entire lines of evidence"). The ALJ's opinion failed to do so.[7]

*Second*, the ALJ found that under the RFC he determined, Ms. Williams could perform her "past relevant work" as a home health aid (R. 20). "Past relevant work" is defined as "work that [a person has] done within the past 15 years, that was substantial gainful activity, and that lasted long enough for [them] to learn to do it." 20 C.F.R. § 404.1560(b)(1). Generally, earnings are the touchstone for determining if employment rises to the level of substantial gainful activity ("SGA"). *See* 20 C.F.R. § 404.1574(a)(1). Ms. Williams argues that the evidence fails to establish that her earnings as a home health aide for Helping Home were at the level of SGA (Pl.'s Mem. at 13). We agree.

---

[7]Defendant suggests that plaintiff waived any claim that further testing or assessment identified by the ME was necessary because, after her attorney was unable to secure further testing for Ms. Williams on her own, she wrote a letter asking that the ALJ "take this matter under advisement at this time" (Def.'s Mem. at 9, citing R. 29-30). We disagree that the letter by Ms. Williams's attorney waived her right to offer development of the evidentiary records. At the threshold, the testing that is identified in the letter by plaintiff's counsel (additional blood tests as well as the results of an angioplasty) is not the testing that the ME identified as something that should be pursued regarding the issues of back and knee pain (straight leg raising testing, the MRI of the lumbar vertebrae, and a consultation by a rheumatologist to determine whether there are any neurological complications of Ms. Williams's joint) (R. 725, 729-30). Moreover, while a "claimant has the burden to prove disability, the ALJ has a duty to develop a full and fair record." *Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000). The ME, whom the ALJ called to testify and to whom he assigned "controlling weight," testified that there was a gap in the medical evidence: specifically, the kind of tests necessary to assess Ms. Williams's complaints of knee and back pain. The ME further stated that assessment of Ms. Williams's complaints of pain, which he said could be "a substantial contributor to her limited mobility at the present" and which he did not take into consideration in finding as to her RFC, was a "factor that should be considered" (R. 725). In light of the testimony by the ME, it was incumbent on the ALJ to obtain the testing, even if plaintiff did not do so – or to provide an explanation as to why, notwithstanding the ME's testimony, the testing was not necessary. Here, the ALJ did neither.

16

The uncontradicted evidence was that Ms. Williams's work as a house health aide was part time only (R. 130, 732). In his decision, the ALJ did not make any finding as to whether Ms. Williams's work as a home health aide met the SGA threshold, and did not even discuss the point (R. 20).[8] Thus, we have no basis on which to review the ALJ's determination that the home health aide job constitutes past relevant work under the statute. If the ALJ did, in fact, rely on Ms. Williams's earnings as a home health aide to reach his decision that the job satisfied the requirements of SGA, or had some other basis for finding that job to be past relevant work, then he was required to articulate the basis for his decision in order to provide the reviewing court with a "glimpse into the reasoning behind [the] decision to deny benefits." *See, e.g., Zurawski*, 245 F.3d at 889. The ALJ failed to do so.

The Commissioner also argues that this Court should take Ms. Williams's Medicare qualified government employment ("MQGE")[9] earnings into account, as these earnings exceeded the SGA threshold in 2000 and 2001 (Def.'s Mem. at 13). Yet, nowhere in the voluminous (742 page) record are the sources of Ms. Williams's MQGE earnings disclosed. What's more, the ALJ's opinion does not cite those earnings as a basis for his finding that Ms. Williams's home health aide job was past relevant work. When viewing the ALJ's opinion, we must consider the opinion he wrote, and not one he might have written. *O'Connor v. Sullivan*, 938 F.2d 70, 73 (7th Cir. 1991); *Sayles v.*

---

[8] In a discussion of Ms. Williams's RFC, the ALJ did note that Ms. Williams's past work as a product demonstrator and part-time substitute teacher/teacher's aide was *not* substantial gainful activity (R. 19), a point he also made during the hearing itself (R. 705). The ALJ stated that Ms. Williams's work in the Fourth Quarter of 2005 and in the First Quarter of 2006 "is not at threshold for substantial gainful activity, but we must think about it in terms of whether or not she could sustain some lower level of exertion[] and whether or not she has transferable skills" (R. 705).

[9] "Medicare qualified government employment means any service which meets the definition of 'employment' for social security purposes except for the fact that the service was performed by a state or local government employee." 70A. Am. Jur. 2d Social Security and Medicare § 146 (citing 42 U.S.C.A. § 401(a); 42 U.S.C.A. § 410(p)(1)(B)).

*Barnhart*, No. 00 C 7200, 2002 WL 989455 *2 (N.D. Ill. May 14, 2002). Because this Court may not decide facts anew, reweigh the evidence, or substitute its own judgment for that of the ALJ, *Herron*, 19 F.3d at 333, we cannot – and do not – use these earnings to bolster the ALJ's opinion.

## CONCLUSION

In summary, we find that the deficiencies in the ALJ's Step 4 analysis require a remand in this case. We express no view as to what the ultimate outcome should be on remand. We leave it open for the ALJ to take new evidence and reconsider all aspects of the case: including the credibility determination that the ALJ made, which the ALJ should revisit in light of any further medical evidence that is developed on remand.[10]

For the foregoing reasons, the Court denies the Commissioner's motion for summary judgment (doc. # 25), and grants Ms. Williams's motion for summary judgment (doc. # 19), remanding the case for proceedings consistent with this decision.

ENTER:

SIDNEY I. SCHENKIER
**United States Magistrate Judge**

Dated: April 9, 2008

---

[10] In light of our decision to remand due to errors at the Step 4 determination, we have no need to decide plaintiff's challenge to the ALJ's credibility determination.